UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD B.,[1]<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Commissioner of Social Security,[2]<br><br>    Defendant. | Case No.:  20cv1431-CAB(MSB)<br><br>**REPORT AND RECOMMENDATION REGARDING JOINT MOTION FOR JUDICIAL REVIEW [ECF NO. 12]** |

---

[1]  Pursuant to Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the Court in [Social Security cases under 42 U.S.C. § 405(g)] will refer to any non-government parties by using only their first name and last initial."

[2]  On July 9, 2021, Kilolo Kijakazi became the Commissioner of the Social Security Administration.  See https://www.ssa.gov/agency/commissioner.html (last visited on November 12, 2021).  The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the defendant in this action.  See Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g) (providing that "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant.").

This Report and Recommendation is submitted to the Honorable Cathy Ann Bencivengo, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California. On July 24, 2020, Plaintiff Chad B. filed a Complaint seeking judicial review of a decision by the Commissioner of Social Security denying his disability, disability insurance benefits, and Supplemental Security Income benefits. (Compl., ECF No. 1.)

Now pending before the Court is the parties' Joint Motion for Judicial Review. (See J. Mot., ECF No. 12 ("J. Mot.").) For the reasons set forth below, the Court **RECOMMENDS** that the Commissioner's decision be **REVERSED**, and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I. PROCEDURAL BACKGROUND

On February 2, 2018, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act. (Certified Admin. R., ECF No. 9 ("AR") at 230–32.) On the same day, Plaintiff also filed an application for Supplemental Security Income under Title XVI of the Social Security Act. (Id. at 233–37.) Plaintiff alleged disability beginning July 1, 2017. (Id. at 230.) After his applications were denied initially on June 21, 2018, (id. at 146–50), and upon reconsideration, on August 31, 2018, (id. at 153–58), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ"), (id. at 159–60). A video administrative hearing was held on June 17, 2019. (Id. at 46–85.) Plaintiff appeared at the hearing with counsel, and testimony was taken from him and a vocational expert ("VE"). (Id.)

As reflected in his August 2, 2019 hearing decision, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 1, 2017, through the date of the decision. (Id. at 26.) The ALJ's decision became the final decision of the Commissioner on May 27, 2020, when the Appeals Council denied Plaintiff's request for review. (Id. at 11–16.) This timely civil action followed.

///

2

20cv1431-CAB(MSB)

## II. SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. See 20 C.F.R. § 404.1520. At step one, the ALJ found that Plaintiff had engaged in substantial gainful activity during the third quarter of 2017; however, the ALJ also found that there had been a continuous twelve-month period during which Plaintiff had not engaged in substantial activity, which is the period the ALJ's findings address. (AR at 27.) At step two, the ALJ found that Plaintiff had the following severe impairments: "[s]equelae of right upper extremity fracture status post motorcycle accident in August 2016; traumatic brain injury (TBI) status post motorcycle accident in August 2016[;] and depression." (Id. at 28.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments. (Id.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to do the following:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except because the claimant is not able to pronate his right arm or fully extend his right elbow, he is limited to occasional overhead reaching and frequent handling and fingering with the right upper extremity. He can perform simple, unskilled work, and he requires a job where there is no more than occasional interaction with coworkers, supervisors and the public and where interaction with the public is not a primary component of the job.

(Id. at 29.)

At step four, the ALJ adduced and accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would be unable to perform any of his past relevant work. (Id. at 37–38, 79–80.) The ALJ then proceeded to step five of the sequential evaluation process. Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy, such as laundry

sorter, inspector/hand packager, and small products assembler, the ALJ found that Plaintiff was not disabled.  (Id. at 38–40.)

### III.  DISPUTED ISSUE

As reflected in the parties' Joint Motion for Judicial Review, Plaintiff is raising the following issue as the ground for reversal and remand:  whether the ALJ's RFC finding was proper and supported by substantial evidence.  (See J. Mot. at 11; see also id. at 4.)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  Id.; see also Miner v. Berryhill, 722 F. App'x 632, 633 (9th Cir. 2018) ("We review the district court's decision de novo, disturbing the denial of benefits only if the decision 'contains legal error or is not supported by substantial evidence.'") (quotation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  See Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

///

## V.  DISCUSSION

Plaintiff contends the ALJ's RFC finding is not supported by substantial evidence. (J. Mot. at 10, 14–15.)  Plaintiff argues that the manipulative restrictions the ALJ assessed are not reasonable in light of his inability to pronate his right arm or fully extend his right elbow.  (Id. at 5–11.)  Specifically, Plaintiff maintains that the ALJ's assessed RFC limitations of frequent handling and fingering, and occasional overhead reaching, only address the "frequency," but not "how" Plaintiff can handle, finger, and reach.  (Id. at 9–10.)  Plaintiff explains that his "inability to turn his [right] palm more than to a point where it faces the other hand, inability to make a fist, or touch his pinky to thumb—so he essentially has a 'claw'—will not change with the frequency of handling and fingering." (Id. at 9.)  He further asserts that the State agency failed to provide clarification regarding the extent of Plaintiff's ability to reach, handle, and finger, which "create[d] a void" that the ALJ improperly filled with his lay opinion.  (Id. at 10.)

Defendant asserts that the ALJ's RFC finding is proper and supported by substantial evidence.  (Id. at 11–14.)  Defendant argues that the ALJ properly considered all of the evidence in the record and took into account Plaintiff's specific elbow and arm limitations.  (Id. at 12–13.)  Defendant also states that the ALJ is responsible for assessing RFC and is not required to rely on any particular medical opinion in doing so. (Id. at 11.)  Finally, Defendant maintains that any alleged error was harmless because Plaintiff fails to establish that he would not be able to perform step-five jobs that the ALJ identified.  (Id. at 13–14.)

### A.  Applicable Law

At step four of the sequential evaluation process, the ALJ is required to determine a claimant's RFC.  See 20 C.F.R. § 404.1520(4)(iv).  The ALJ assesses whether the claimant's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting."  Id. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ assesses the claimant's RFC "based on all the

relevant evidence in [the] case record." Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017). 20 C.F.R. § 404.1545(a)(3) provides the following with respect to evidence used to assess the claimant's RFC:

> we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.

Id. (internal citations omitted). In assessing the claimant's RFC, the ALJ must consider the limiting effects of all of the claimant's impairments, including non-severe impairments. Id. §§ 404.1545 (e). "[A]n RFC that fails to take into account a claimant's limitations is defective." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).

### B.   Plaintiff's Records and Testimony During Administrative Hearing[3]

#### 1.   Relevant testimony during Plaintiff's administrative hearing

Plaintiff testified that on August 27, 2016, he was involved in a motorcycle accident and sustained a "severe traumatic brain injury," compound fractures of his right arm, ulna, and radius, a collapsed right lung, and four broken ribs. (AR at 46, 53.) He stated that the compound fractures of his radius and ulna were "so bad," that his orthopedic surgeon advised him that "nine out of ten hospitals would have just cut [Plaintiff's] arm off just below [his] shoulder." (Id. at 53.) Plaintiff had three different surgeries during which hardware and wires were placed in his right upper extremity. (Id. at 56.)

---

[3] Because the disputed issue in this case concerns Plaintiff's manipulative limitations in his right hand and arm, the Court will focus on Plaintiff's records and testimony concerning his orthopedic limitations.

Plaintiff also testified that he was right-handed. (Id. at 55.) Every day he experienced pain in his right arm, and the arm was difficult to use. (Id.) Plaintiff could not make a fist and did not have the dexterity in his hand that he used to have, and his grip strength was "greatly reduced." (Id.) He could lift a quart of milk at most, but could not lift a gallon because "his wrist wo[uldn]'t support that weight." (Id. at 57.) Plaintiff also testified that his ability to do computer work or write was "very limed," and he could write no more than half a page because of pain. (Id.) Plaintiff's wrist hurt, did not bend, and had a limited range of motion. (Id. at 58.) Plaintiff had been undergoing physical therapy for over three years, which helped; but he lost coordination in his right hand, and his thumb could not touch his pinky finger. (Id. at 59–60.) He was not able to turn his right palm up; the most he could turn it was to the point where the palm faced his left hand. (Id. at 62–63.)

During the hearing, Plaintiff demonstrated that he could not make a fist with his right hand because his four fingers pointed in. (Id.) Plaintiff's wrist was described on the record as looking deformed like an "S shape" or a "claw," and his right arm looked "cockeyed." (Id. at 58–60.) Plaintiff was not able to fully straighten his right arm because his elbow did not "fully extend," and he had a limited range of motion in his right shoulder. (Id. at 61–62.)

Plaintiff testified that he volunteered up to four hours twice a week at the community program that he graduated from. (Id. at 71, 76.) He explained that he mentored people "that [were] going through the exact thing that [he had] gone through." (Id. at 71.) His volunteer duties included wiping down the equipment used by therapists, handing therapists the equipment they needed during therapy sessions, and wiping down tables before lunch service. (Id. at 76–77.) Plaintiff further testified that he would not be able to do "this type of work" eight hours a day, five days a week. (Id. at 77.)

///
///

### 2. Function Report dated March 31, 2018

Plaintiff wrote in his Function Report that he had limited function and range of motion in his right dominant arm, which "limit[ed] [him] severely." (Id. at 265; see also id. at 273.) He did not require help with personal care, prepared frozen dinners "every couple of days," but the meals took him about 45 minutes to prepare; and he did laundry, dishes, and house cleaning for 4–5 hours "every couple of days." (Id. at 266–67.) Plaintiff further stated that his injuries affected his ability to lift, reach, and use hands, and noted that his "right arm only ha[d] 20%," and he could not straighten his arm. (Id. at 270.)

### 3. Third-Party Function Report dated March 31, 2018

Plaintiff's mother stated in her Third-Party Function Report that Plaintiff had to use his left hand as a dominant hand to perform personal care activities, needed help with buttons when dressing, could not cut or chop food, and could not do yard work. (Id. at 287–89.) She further wrote that Plaintiff was limited in his ability to lift, reach, and use hands. (Id. at 291.) She also stated that Plaintiff had "very limited use of right arm" and was not able to reach with his right arm. (Id.)

### 4. Medical records

On August 27, 2016, Plaintiff was involved in a motorcycle accident and was treated at the Palomar Pomerado Medical Center. (Id. at 374.) He sustained a compound right arm fracture, right rib fracture, collapsed lung, and traumatic brain injury as a result of the accident, and was in a coma for over four days. (Id. at 66, 376, 618.) Plaintiff underwent open reduction and internal fixation to repair a radius fracture and olecranon fracture. (Id. at 376.) He also had an open reduction and internal fixation with tension band of the proximal ulna, open reduction and internal fixation of his radius with ulnar head resection, and a radial head resection of his right elbow in February 2017. (Id.) Plaintiff's orthopedic surgeon, Dr. Campbell, wrote in his post-operative notes that Plaintiff's injury was one of the worst distal radius fractures he had treated in his career. (Id. at 480.)

On December 1, 2016, an X-ray of Plaintiff's right wrist showed "stable and intact hardware status post ORIF of a chronic comminuted fracture of the distal radius," and his distal ulna was partially resected and stable. (Id. at 402, 465.) There was no acute fracture or dislocation, and no bony erosion. (Id.)

On July 12, 2017, Dr. Levinston examined Plaintiff and reported the following musculoskeletal findings: abnormal range of motion, inability to straighten right elbow, deformity of right wrist, and ulnar deviation. (Id. at 357, 359.) His neurologic findings included slight weakness of right hand. (Id. at 359.)

Plaintiff's physical therapy notes dated July 31, 2017, stated that he was "doing well with moderate stiffness." (Id. at 387.) The goal was to increase range of motion in his right wrist "to allow for normal movement in selfcare." (Id. at 388.) Plaintiff's August 2, 2017 therapy notes contained identical entries. (Id. at 452–53.)

On August 14, 2017, Plaintiff consulted Dr. Garay to discuss treatment for his persistent stiffness in the right elbow and wrist. (Id. at 376.) Plaintiff's physical evaluation revealed the following:

> range of motion of shoulder, forward flexion 180, abduction 180. Elbow reveals a surgical incision consistent with both radial head excision as well as open reduction and internal fixation of the olecranon. There is palpable hardware with cerclage tension, wires as well as intramedullary pins, which are quite palpable in the posterior aspect of the elbow. Range of motion at the elbow is 90 degrees of flexion, lacking 20 degrees of extension. Pronation and supination of the forearm is confined to 45 degrees. Wrist range of motion, dorsiflexion to 30 degrees, palmar flexion to 30 degrees with radial, ulnar deviation of 10 degrees. The patient is able to make a complete fist at this time. There is a lack of some extension of roughly 20 degrees seen primarily at the CMC joint. There is palpable hardware noted in the volar aspect of the wrist consistent with volar plating. The radial aspect of the plate appears to be quite prominent overlying the soft tissue at the base of the thumb. Surgical incisions well healed.

(Id. at 377.) Dr. Garay advised Plaintiff to consider removing the hardware in his right elbow and wrist. (Id. at 378.) With respect to Plaintiff's overall hand function, Dr. Gary noted that "it is quite good at this time, motion is quite good with excellent sensory

function." (Id.) He further opined that Plaintiff may experience "some improvement in thumb motion once the plate is removed." (Id.)

On August 30, 2017, Dr. Levinson stated in his progress notes that Plaintiff had completed upper extremity hand therapy, made improvements, and would be attending several vocational training programs next month. (Id. at 361.) Plaintiff's right forearm did not have tenderness, and his range of motion was slightly limited on extension. (Id. at 362.)

On November 6, 2017, Plaintiff reported to Dr. Levinson that he lived independently, was able to drive, manage his activities of daily living, and perform volunteer work twice a week. (Id. at 364.) Plaintiff's musculoskeletal examination revealed "[f]lexion deformity right elbow, deformity over the radial head of the right wrist." (Id. at 365.) His neurological examination noted weakness "4 out of 5 [in] right upper extremity." (Id. at 366.) Dr. Levinson assessment included right wrist pain and pain of right upper extremity. (Id.)

On December 14, 2017, Dr. Askim conducted a physical examination of Plaintiff. (Id. at 447–48.) She noted that Plaintiff was unable to fully pronate his right arm due to "orthopedic restrictions." (Id. at 448.)

On February 22, March 5, and March 19, 2018, Dr. Seibert conducted a neurological evaluation of Plaintiff. (Id. at 618.) Dr. Seibert wrote the following with respect to Plaintiff's fine motor skills:

> This patient's fine motor dexterity with his right hand was not tested, because he showed obvious difficulties in his attempts to even grasp the small pegs used as test stimuli, much less manipulate them as required by this test. (The test requires one to manipulate small, grooved pegs so they fit into grooved holes.) He showed significantly reduced range of motion in his right hand, fingers, and wrist. He has a history of multiple fractures to this upper extremity sustained in his MVA [motor vehicle accident]. His left/nondominant hand was assessed, and demonstrated low average performance on this fine motor dexterity test (Grooved Pegboard Test: 24th percentile).

(Id. at 622.)

On June 6, 2018, Dr. Whitehead conducted a psychological consultative examination of Plaintiff.  (Id. at 410–15.)  Plaintiff reported that his right arm "ha[d] a lot of pain and loss of function."  (Id. at 410.)  Dr. Whitehead stated, in relevant part:

> This claimant reports that he has some difficulty with general daily tasks around the home because of his reported problems, but on his own schedule and timing he can undertake and perform general daily tasks and activities around the home.  The claimant can perform general household chores such as taking out the trash, dusting, cleaning, mopping, sweeping, vacuuming, dishes, laundry, etc.  He is able to cook and prepare foods.  He does not require assistance with showering, dressing, bathing, toileting, or other personal hygiene activities.  This claimant can drive and is able to take public transportation.

(Id. at 411.)  Dr. Whitehead further stated that Plaintiff was not able to fully straighten his right arm and had limited grip ability.  (Id. at 412, 414.)

On June 6, 2018, on initial review, State agency physician Dr. Brodsky reviewed Plaintiff's medical records and assessed Plaintiff's limitations.  (Id. at 93–95.)  He concluded that Plaintiff could lift and carry 20 pounds "occasionally" and 10 pounds "frequently."  (Id. at 94.)  Dr. Brodsky further opined that Plaintiff was able to sit, stand, and/or walk, with normal breaks, six hours in an eight-hour day.  (Id.)  Dr. Brodsky also concluded that Plaintiff had "manipulative limitations" and was "limited" in the ability to reach overhead, as well as handle and finger with his right upper extremity.  (Id.)  Dr. Brodsky explained Plaintiff's manipulative limitations as follows:  "RUE [right upper extremity] restricted by residue of ORIF [open reduction and internal fixation] of distal radial and olecranon fractures.  Unable to pronate the RUE or fully extend elbow."  (Id.)

On August 21, 2018, on reconsideration, Dr. Christian reviewed Plaintiff's medical records.  (Id. at 120–22).  He affirmed Dr. Brodsky's assessment.  (Id. at 122.)

On November 9, 2018, Plaintiff was admitted to Sharp Memorial Hospital reporting that he "lost balance and fell on right arm."  (Id. at 693.)  Plaintiff complained

of shoulder pain and swelling. (Id.) Plaintiff's x-rays showed a proximal ulnar shaft fracture. (Id. at 694.)

On November 30, 2018, Plaintiff had elbow, forearm, and wrist evaluation at the Sharp Memorial Rehabilitation Center. (Id. at 627.) His diagnosis was "right elbow fracture." (Id.) The notes stated that Plaintiff "ha[d] been independent and functional prior to this re[-]fracture," but after his proximal ulnar shaft fracture, Plaintiff had the following functional limitations: "CANNOT open items such as jars, lift and carry; perform sports; SEVERE difficulty with dressing fasteners; grasping small objects; personal care; domestic duties; leisure activity; work tasks; MODERATE difficulty with driving." (Id.) Plaintiff reported pain "in forearm along ulna at fracture site; average pain is 8/10, least amount of pain 2-3/10; often wakes him at night." (Id.) Range of motion in Plaintiff's right extremity was as follows: elbow flexion (-35 -120), pronation (0), supination (45), wrist flexion (40), extension (20), radial deviation (0), ulnar deviation (20). (Id.) Plaintiff's condition was described as: "RIGHT DOMINANT RE FRACTURE NEXT TO PREEXISTING HARDWARE; EXTREME PAIN; LIMITED MOTION AND USE OF RUE [Right Upper Extremity]." (Id. at 628.) Plaintiff reported "performance deficits" with bathing/showering, grooming/hygiene, dressing, home management, and meal preparation due to decreased range of motion and strength, edema, and pain. (Id.)

On December 11, 2018, Plaintiff's hand therapy note stated that he "[ha]s been in extreme pain today. Took Ibuprofen before treatment; slightly improved. States he is now able to wash/style hair; put deodorant on; reach mouth. Would like to be ABLE to do: tuck shirt in; cook at the stove; pull covers off of him." (Id. at 636.)

On December 13, 2018, Plaintiff's hand therapy note listed the following condition description: "RHD Fx near PRE-EXISTING HARDWARE; EXTREME PAIN; LIMITED MOTION AND USE OF Right UE [Upper Extremity]." (Id. at 568.) Plaintiff's pain was "8/10"; he reported that over-the-counter pain medications were not helpful, and

he did not want to use opiates. (Id.) Plaintiff was able to apply deodorant and comb his hair, but he was not able to make a fist or wash dishes. (Id.)

An X-Ray of Plaintiff's right elbow dated January 14, 2019, showed the following:

> There is a healing fracture of the proximal right ulna. It remains well aligned with cerclage wires and K wires as before. The fracture appears to be healing, the fracture margins are less distinct with findings of early bony bridging. This fracture is just distal to the cerclage wires which were placed to treat a more proximal olecranon fracture that now appears healed. There appears to have been resection or reabsorption of the radial head, unchanged. There is appropriate alignment, [and no] joint effusion. There is a[n] incompletely visualized distal right radial fracture. There is tapered sclerosis of the distal ulna which is generally similar to 8/14/2017.

(Id. at 680.) The impression was "[h]ealing proximal ulnar fracture just distal to cerclage wires/tension band involving the proximal ulna. The more remote olecranon fracture has healed." (Id.)

Plaintiff's January 21, 2019 hand therapy note stated: "[p]atient CANNOT perform personal care such as shaving; domestic duties; leisure activity; has SEVERE difficulty with opening items such as jars; lifting and carrying; and MODERATE difficulty with driving; dressing fasteners; grasping small objects; sports or work tasks." (Id. at 579.) Plaintiff reported pain "in forearm along ulna at fracture site; average pain is 8/10, least amount of pain 2-3/10; often wakes him at night." (Id.) His range of motion in the right extremity was as follows: elbow flexion (-20 -105), pronation (60), supination (55), wrist flexion (40), extension (20), radial deviation (0), and ulnar deviation (20). (Id. at 580.) Coordination in his right hand was "poor gross and fine motor." (Id.) Plaintiff's condition was described as "RIGHT DOMINANT RE FRACTURE NEXT TO PRE EXISTING HARDWARE; EXTREME PAIN; LIMITED MOTION AND USE OF RUE[.]" (Id.) Plaintiff had difficulties with bathing/showering, grooming/hygiene, dressing, home management, and meal preparation due to decreased coordination, range of motion, and strength, poor posture and postural awareness, and pain. (Id.)

According to Plaintiff's January 31, 2019 hand therapy note, he was able to use his right arm more functionally, but continued having difficulties with supination. (Id. at 641.) On February 18, 2019, he struggled with grasping the handle of an elliptical machine "because tip of [his] thumb doesn't bend as well as it did in the past." (Id. at 643.)

An X-ray of Plaintiff's right elbow dated February 22, 2019 showed "slightly more callus associated with the fracture proximal ulna." (Id. at 651.) The fracture line was evident, and orthopedic pins and cerclage wires were noted. (Id.)

On March 12, 2019, Plaintiff reported during his physical therapy session that his "[r]adial wrist pain continues to be bothersome with routine ADL [activities of daily living]." (Id. at 640.) On March 26, 2019, he reported "[d]ifficulty grating cheese." (Id. at 642.) On April 9, 2019, Plaintiff's hand therapy note stated that his pinch strength was weak and there was "[c]licking in elbow when moving elbow through full arc of motion." (Id. at 644.)

### C. Discussion

Plaintiff's testimony and evidence in the medical records show that his right arm injuries required three different surgeries, insertion of hardware and wires, and extensive hand therapy. (Id. at 56, 377, 627–44.) Plaintiff's records further demonstrate that he cannot fully extend his right elbow or pronate his right arm. (Id. at 61–63, 359, 365, 376, 381, 564–65, 568, 618.) Notably, in November 2018, Plaintiff fell and fractured his right proximal ulna. (Id. at 693–95.) The ALJ determined Plaintiff's RFC, finding, in relevant part, that Plaintiff was capable of performing "light work . . . except because the claimant is not able to pronate his right arm or fully extend his right elbow, he is limited to occasional overhead reaching and frequent handling and fingering with the right upper extremity." (Id. at 29.)

In making his RFC determination, the ALJ found that "[d]espite [Plaintiff's] combination of alleged impairments, the claimant has engaged in a somewhat normal level of daily activity and interaction[,]" and "the claimant's ability to participate in such

activities is inconsistent with his allegations of functional limitations." (Id. at 33.) Specifically, the ALJ noted that Plaintiff was able to live alone and independently perform the following activities: "light housecleaning, going to the grocery store, performing self-care activities such as dressing and bathing, socializing with others, driving, managing his finances, and displaying sufficient concentration and attention to attend classes, and perform volunteer work, up to four days a week." (Id.; see also id. at 30.)

As an initial matter, many activities of daily living that the ALJ cited do not directly implicate Plaintiff's ability to use his right hand and arm. Additionally, although the ALJ cited Plaintiff's ability to manage his finances, attend classes and perform volunteer work, (id. at 33), the ALJ did not acknowledge that Plaintiff also reported that most of his bills were automatically paid, and he attended classes to "learn more strategies to compensate for his disabilities" and volunteered to "improve his cognitive difficulties," (id. at 619). Further, Plaintiff's medical records contain numerous entries from medical care providers documenting significant difficulties with activities of daily living stemming from Plaintiff's decreased manipulative abilities in his dominant right hand after Plaintiff refractured his right ulna on November 9, 2018. (See id. at 627–28 (November 30, 2018 hand therapy note stating that Plaintiff "ha[d] been independent and functional prior to this re[-]fracture," but after his proximal ulnar shaft fracture, he had the following functional limitations: "CANNOT open items such as jars, lift and carry; perform sports; SEVERE difficulty with dressing fasteners; grasping small objects; personal care; domestic duties; leisure activity; work tasks"; also noting difficulties with bathing/showering, grooming/hygiene, dressing, home management, and meal preparation due to decreased range of motion, strength, edema, and pain); id. at 636 (December 11, 2018 note that Plaintiff is not able to "tuck shirt in; cook at the stove; pull covers off of him"); id. at 568 (December 13, 2018 hand therapy note that Plaintiff is "[u]nable to make fist[,] wash dishes"); id. at 576, 579–80 (January 21, 2019 hand therapy note that Plaintiff "CANNOT perform personal care such as shaving; domestic

duties; leisure activity; has SEVERE difficulty with opening items such as jars; lifting and carrying"; also noting difficulties with bathing/showering, grooming/hygiene, dressing, home management, and meal preparation due to decreased coordination, range of motion, and strength, as well as poor postural awareness and pain); id. at 643 (February 18, 2019 note that Plaintiff has difficulties with grasping a handle "because tip of [his] thumb doesn't bend"); id. at 640 (March 12, 2019 note that Plaintiff's "[r]adial wrist pain continues to be bothersome with routine ADL [activities of daily living]").).

The ALJ further determined that a more restrictive RFC finding was not warranted because Plaintiff's "exam findings were at times normal," and cited portions of the record showing that Plaintiff had full motor strength in the extremities, exhibited no tenderness in his right arm, and had intact sensation, normal coordination, as well as normal deep tendon reflexes. (Id. at 36.) Although some of Plaintiff's exam findings were "at times normal," Plaintiff's medical records after his fracture of the right ulna in November 2018, contain hand therapy notes consistently documenting significant restrictions in Plaintiff's ability to handle, finger and reach with his right hand and arm. (See id. at 564, 568, 576, 579–80, 627–28, 636, 640, 643.)

Additionally, State consultative examiners, whose opinions the ALJ found "generally persuasive," opined that Plaintiff was "limited" in his handling, fingering, and reaching, but did not further describe or explain Plaintiff's specific manipulative limitations. (See id. at 107, 135.) Notably, those opinions predated Plaintiff's fracture of his right ulna in November 2018 by several months. (See id.; see also id. at 693–95.)

In Social Security cases, the ALJ has a duty to develop the record fully and fairly, and to assure that the claimant's interests are considered, and this special duty exists even when the claimant is represented by counsel. See Garcia v. Comm'r Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). "The ALJ must develop the record" when there is "ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (quotation omitted). The Court agrees with Plaintiff

that although the ALJ had multiple available avenues to clarify the record, such as calling a medical expert to testify at the hearing, ordering an updated consultative examination, or remanding the matter for an updated determination based on Plaintiff's most recent medical evidence, (see J. Mot. at 10), the ALJ did not pursue any of those avenues. Despite acknowledging that Plaintiff "fell and fractured his right ulnar shaft" in November 2018,[4] and that this injury resulted in reduced range of motion in Plaintiff's right wrist and elbow, (AR at 31), the ALJ did not take any steps to supplement the record, and incorrectly determined that the record was sufficiently complete to allow him to determine Plaintiff's RFC. As such, the ALJ's RFC finding that Plaintiff can occasionally reach overhead, and frequently handle and finger with the right upper extremity is not reasonable. See Garcia, 768 F.3d at 930; Tonapetyan, 242 F.3d at 1150; McLeod, 640 F.3d at 885; see also 20 C.F.R. § 404.1545(a)(3) ("we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary[.]"). For the foregoing reasons, the Court finds that the ALJ's assessed RFC that Plaintiff can "frequently" handle and finger, and "occasionally" reach overhead, was not supported by substantial evidence in the record. See Valentine, 574 F.3d at 690 ("[A]n RFC that fails to take into account a claimant's limitations is defective."); Jenkins v. Astrue, No. C10–891–RAJ–JPD, 2011 WL 722184, at *8–9 (W.D. Wash. Jan. 19, 2011) (finding that the ALJ's RFC finding that plaintiff could "handle and finger on a frequent basis" did not "properly account for the nonexertional limitations relating to 'how the [plaintiff] should use her hands'") (emphasis added); see also Sean M. v. Berryhill, Case No.: 3:18-cv-02272-GPC (RNB), 2019 WL 2436539, at *3 (S.D. Cal. June 11, 2019) (finding that the ALJ's failure to either follow up with plaintiff's treating physicians or order a consultative examination violated the ALJ's special duty to fully

---

[4] It appears from the ALJ's written decision that he might have overlooked the year of Plaintiff's most recent fracture of his right ulna (2018), because despite describing Plaintiff's medical records in chronological order, the ALJ discussed Plaintiff's November 2018 fracture of his right ulna in the paragraph immediately preceding his discussion of Plaintiff's December 2017 medical records. (See AR at 31.)

and fairly develop the record, and "resulted in a decision that was not supported by substantial evidence, but rather was based on pure conjecture."); Molina v. Berryhill, No. 2:17-cv-01991 CKD, 2018 WL 6421287, at *4 (E.D. Cal. Dec. 6, 2018) (finding that the ALJ's RFC determination was not supported by substantial evidence, where the ALJ made her own evaluation of the functional limitations caused by the claimant's diagnosed impairments without further developing the record through a consultative examination); Rivera v. Berryhill, Case No. ED CV 16-791-SP, 2017 WL 5054656, at *4–5 (C.D. Cal. Oct. 31, 2017) (holding that the ALJ's RFC determination was not supported by substantial evidence, where the treatment records did not provide sufficient indications of plaintiff's functional limitations, and no physician who had reviewed the medical records had provided an opinion regarding the claimant's specific functional limitations).

Further, the Court cannot find that the ALJ's error "was inconsequential to the ultimate nondisability determination" and therefore harmless. See Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008). As discussed above, the ALJ's assessed RFC limited Plaintiff to "light work" and "occasional overhead reaching and frequent handling and fingering with the right upper extremity." (AR at 29.) Various degrees of limitation would affect the types and numbers of jobs that Plaintiff could perform:

> [r]eaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work-related activities.  Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs.  Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do.  Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations.

SSR 85-15, 1985 WL 56857, at *7 (1985).  The regulation further provides that fingering "is needed to perform most unskilled sedentary jobs and to perform certain skilled and semi[-]skilled jobs at all levels of exertion." Id.  Further,

> limitations of fine manual dexterity have greater adjudicative significance—in terms of relative numbers of jobs in which the function is required—as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work.

Id.

Based on the record before it, the Court cannot determine what the result would have been had the ALJ properly considered Plaintiff's current manipulative limitations in his dominant right hand and arm when assessing Plaintiff's RFC, and how the VE would have testified had more restrictive limitations been included in the hypotheticals posed to the VE. Accordingly, the Court concludes that the ALJ error was not harmless. See id.; see also Godfrey v. Saul, Case No.: 20-CV-917-WVG, 2021 WL 3810561, at *17 (S.D. Cal. Aug. 26, 2021) (finding that the ALJ's error was not harmless and remand for further consideration was appropriate, where the ALJ "might re-evaluate the RFC in its entirety.").

## VI.  CONCLUSION AND RECOMMENDATION

The reviewing court may enter a "judgment affirming, modifying, or reversing" the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the case to the Social Security Administration for further proceedings. Id. The reviewing court has discretion in determining whether to remand for further proceedings or award benefits. See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision. See Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, where the record has been fully developed, or where remand would unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir. 1985); Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980).

In this case, Plaintiff requests "an order from the Court reversing the final decision and remanding for further proceedings." (J. Mot. at 15.) Defendant asks the Court to "affirm [the Commissioner's] final decision," or "[s]hould the Court disagree . . . remand for further proceedings." (Id. at 15–16.) The Court has concluded that remand for further proceedings is warranted because additional administrative proceedings could remedy the defects in the ALJ's decision.

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's decision be **REVERSED**, and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS ORDERED** that no later than **December 13, 2021**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **December 20, 2021**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: November 29, 2021

Honorable Michael S. Berg
United States Magistrate Judge